UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THOMAS FREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:03-cv-1896-DFH-VSS |
| | ) | |
| WORKHORSE CUSTOM CHASSIS, LLC, | ) | |
| GRAND VEHICLE WORKS HOLDINGS | ) | |
| CORPORATION and ANDREW TAITZ, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In May 1999, plaintiff Thomas Frey left his long-time employer to take up the challenge of leading a start-up company as president of defendant Workhorse Custom Chassis, LLC ("Workhorse"). Frey negotiated his move to Workhorse with defendant Andrew Taitz, CEO of Workhorse and chairman and CEO of its parent company. Taitz promised Frey that if Workhorse's equity value grew while Frey was the president, he would participate in the financial benefit of that growth. Workhorse grew substantially, but Taitz failed to follow through with his promise to allow Frey to reap a portion of the financial benefits of that growth. Frey resigned in 2003 and was denied a bonus for 2002 that he believes he earned.

Frey has sued for breach of contract, promissory estoppel, constructive fraud, and violation of Indiana's Wage Payment Statute. Defendants have moved

for summary judgment on all claims.  As explained below, disputed issues of material fact prevent summary judgment for Workhorse and its parent company on two claims:  (1) Frey's promissory estoppel claim based on the promise to let him share in growth in equity value, and (2) his breach of contract claim for failure to pay a bonus for his last year with Workhorse.  Workhorse and its parent company are entitled to summary judgment on all other claims.  Defendant Taitz is entitled to summary judgment on all claims.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving parties entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving parties must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; it

must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255.

*Undisputed Facts*[1]

The following factual account is not necessarily accurate, but because defendants have chosen to move for summary judgment, the following facts are either undisputed or reflect the evidence in the light reasonably most favorable to Frey, the party opposing summary judgment.  In early 1999, Frey was employed as president of a company called DeZurik when he was contacted by a recruiter regarding an opportunity to serve as president of Workhorse.  DeZurik was a business unit of SPX Corporation, formerly known as General Signal.  For more than fifteen years, Frey had worked in one capacity or another for SPX/General Signal.  In 1999 Frey's annual salary with DeZurik was $205,000 with a bonus

---

[1]This court's local rules require a party responding to a summary judgment motion to include a section in his brief "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment."  S.D. Ind. Local Rule 56.1(b).  Plaintiff has not done that.  He has included his own fact section in his brief with a favorable account of the facts, Rule 56.1(b) calls for a more specific response:  "the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy" if they are not specifically controverted in the opposing party's "Statement of Material Facts in Dispute."  The court has referred to the plaintiff's "fact section" of his brief in an attempt to determine the true factual disputes and to examine the facts in a light most favorable to him.  Where it was unclear whether specific factual statements set forth by defendants were being contested, however, the court has treated such statements as undisputed.

opportunity that he says was on target for $103,000.  He also was a participant in a long term incentive program.

Frey was not actively looking for other employment, but he decided to meet with Taitz to discuss the possibilities at Workhorse.  Frey was interested in a new challenge.   At the same time, he also wanted to be sure that there was an opportunity for him to benefit financially if he succeeded for the company, especially in light of the bonus and long term incentive programs and stock options he would have to leave behind at DeZurik.  After several meetings, Taitz sent Frey a written offer of employment dated May 4, 1999:

> As we have discussed, we would like to extend you an offer of employment for the position of President of Workhorse Custom Chassis, LLC.  This letter sets out the terms of employment:
>
> * You will join the company as a full time employee by June 1, 1999.
> * Your base salary will be $225,000 per year
> * You will be entitled to 3 weeks vacation per year
> * You will be employed working out of Union City, Indiana and the expectation is that you will move your family to the region in a reasonable time frame.  The company will pay for your temporary living costs for a reasonable period, and will pay for a return trip for you and your wife for the purposes of house hunting.  Once you decide to relocate, the company will pay the costs of relocating you and your family, which will include your moving costs and half the closing costs on your principal residence.
> * Under your direction we will implement an Economic Value Added incentive compensation plan in which you will participate.  You will also participate in a Phantom Equity Plan, which will afford you the opportunity to benefit from an appreciation in the

company's equity.

After receiving the written offer of employment, Frey spoke to Taitz to seek more specifics on the potential non-salary financial rewards.   Frey especially

wanted to know how he would share in any increase in the equity value of

Workhorse.  After that conversation, he wrote a follow up letter to Taitz dated

May 10, 1999:

>Thank you again for the offer to join your team.  Workhorse represents an exciting opportunity.  I would like to clarify and refine some details in anticipation of accepting your offer.  My only objective is to be close to neutral in the short term, and then help to create an excellent upside for Workhorse in the medium term.
>
>* I have, on following pages, included an outline of the Change of Control agreement drafted by General Signal.  I will forward a full plan to you.  An agreement between us does not have to be exactly the same, or even drafted right now.  A simple agreement that we will have a similar plan is fine with me.
>
>* I am enclosing some information regarding my current EVA bonus plan.  This is for your info as you've already offered a similar plan.  The plan has a target of 50% of salary, with a multiplier of about 2.7 for hitting the operating plan.  I through this plan [sic] and will have to forfeit it.
>
>* Can we clarify how the "phantom stock" will be determined a little more?  The upside is the clear reason for joining Workhorse, and represents an exciting opportunity financially as well as professionally.  But I have no idea what the significant improvement of the business I envision might be worth without it being tied to something.
>
>* I currently have 2 times salary as life insurance, and would appreciate it if this might be reconsidered.  It's obviously not a "showstopper", but is much less expensive as part of a group policy.  I'd be willing to have any additional policy cost reduce my salary.
>
>* Long service and past corporate practice protect my family from any sudden changes, which are unlikely anyway, in my current situation.  I expect to perform well and for Workhorse to be successful.  But there are some things not entirely within our control in a startup.  I would appreciate some protection for my family in the first couple of years if the opportunity is no longer available to me (other than being removed for cause, of course).

These are the clarifications I mentioned Andrew, and would be very helpful to me.

After further telephone conversations, Taitz responded with a letter dated May 14, 1999, which stated in pertinent part:

I am really excited with the fact that you have decided to join Workhorse and look forward to developing this great opportunity with you. I am writing to respond to your letter of May 10th as best as I can at this stage.  If there is any further information I can clarify please give me a call over the weekend at home . . . .

1.    I have forward (sic) the Change of Control document to our attorneys to adapt to a Workhorse document and I will forward you the revised document.

2.    Thanks for sending your current EVA Plan.  I propose that you and I sit down and adapt this plan to Workhorse's capital structure and allow you the same income opportunity from this plan.

3.    I am enclosing a copy of the most recent draft of the "phantom stock" plan.  If you have any questions on how it works I will arrange a conference call with the attorneys.  This should allow you to participate in all the equity value creation.

4.    I will arrange for a similar life insurance policy for yourself as you proposed in your letter.

5.    Unfortunately I am not in a position to propose an employment contract that provides for any type of guarantees.

During the conversations Frey had with Taitz between letters, Taitz indicated that the "phantom stock" program would enable Frey to participate in the equity growth of the company at a "normal" or "reasonable" rate for the president of a start-up company.  According to Taitz, Frey would participate as though he were receiving real stock, except that it would not be real stock because the corporation could not issue more stock, and Frey would receive no voting

rights.  Frey testified that Taitz spoke in general terms regarding the large amount of money the president might make if Workhorse increased in value and was sold off in whole or in part.  Frey and Taitz never agreed on any specific amount or percentage of any equity participation for Frey, either before or after he left DeZurik.

Without further resolution of those aspects of the agreement, Frey agreed to join Workhorse.  He believed he would not lose money in the short run, and he was satisfied that the details of the phantom stock plan would be worked out when the corporate structure of the new company was firmed up.  He saw a larger reward down the road and decided to make the move.  The precise timing of his decision is the subject of some dispute, especially in relation to Frey's communications with DeZurik's owners.  Frey made his decision at some point between his letter of May 10, 1999 and Taitz's letter of May 14, 1999.  Frey testified about his decision:

> And so the reason was if I could just stay neutral and I have this upside equity opportunity, I'm willing to take the risk and make a decision to give up benefits that I have and opportunities that I have, because I can stay neutral and then I believe with the confidence in myself and looking at the opportunity that we can create significant upside equity value to the business.
>
> And if I participate in that, that opportunity – I agreed with Andrew [Taitz] – is a very significant opportunity and a good reason for me to make that decision.

On May 10, 1999 Frey prepared a letter of resignation which he sent to his superior at SPX Corporation on May 11th.  Frey wrote that he would be retiring

effective the end of 1999. Frey had SPX stock options and other benefits that would vest if he stayed with DeZurik through age 55, which he would reach in late November 1999.

Neither Taitz nor SPX accepted Frey's proposed delayed departure from DeZurik. Taitz told Frey he wanted him on the job at Workhorse as close to June 1, 1999 as possible. SPX's John Blystone told Frey that since he was leaving DeZurik, he was leaving immediately. SPX and Frey then negotiated a separation agreement under which Frey resigned from his position as president of DeZurik. Frey received salary payments for another full year but gave up any interest in DeZurik's bonus plan and the SPX/General Signal stock compensation plan, leaving previously granted stock options unvested. Frey received the negotiated severance agreement on May 18, 1999. He signed it on June 2, 1999, with an effective date of May 13, 1999.

On June 1, 1999, Frey began his tenure as the president of Workhorse. At that time, the company was essentially a break-even operation. Workhorse was established by Taitz to manufacture a chassis line, the right to which he had purchased from General Motors. The chassis was suitable for buses, motor homes, and commercial vehicles, and would be manufactured out of a new factory in Indiana. The company rapidly grew in profitability. Approximately a year after Frey joined Workhorse, Taitz sold a 72% interest in the parent company, GVW, whose only profitable enterprise was Workhorse, to a prominent investment entity

known as The Carlyle Group.   Taitz owned 53% of GVW.  As a result of the sale, he and others made millions of dollars.  Frey received no additional compensation or distribution of any sort as a result of the sale.

Between the time Frey became president of Workhorse and the partial sale to The Carlyle Group in the fall of 2000, no phantom stock plan or other program was instituted to allow Frey to participate in the increased equity value of the company.  A few months following the sale to The Carlyle Group, Frey reminded Taitz of his promise to allow him to participate in the financial benefits of any increase in the equity value of the company.  Taitz put him off, saying he was working on an equity package that Frey would like and that would give Frey the biggest equity reward in the company.  A representative of The Carlyle Group also confirmed to Frey that a stock option plan was in the works.

Despite prodding by Frey, neither a bonus plan nor an equity participation plan was adopted.  Finally, in June or July 2001 Taitz announced that Frey and approximately a dozen other managers would receive stock options.  Frey's options were to issue at $10.20 a share.  That price did not reflect any financial reward for the increase in equity value prior to the sale to The Carlyle Goup.   Frey complained to Taitz about the lack of reward for the increased value prior to the sale.  Taitz continued to put him off, saying he would see what he could do as he worked out the details of the plan.  In February 2002 the stock option plan was executed and the options were issued without Frey's having received anything

additional for the increase in Workhorse's equity value during his first year as president.

During 2002 Taitz began drafting a bonus plan for Workhorse management. The plan originally called for Frey to receive a bonus of 100% of his salary if Workhorse attained a certain "EBITDA" target (earnings before interest, taxes, depreciation and amortization). Though not content with the bonus program as a way for Taitz to live up to his pre-hire promises, Frey provided some input on the program. On September 30, 2002 Taitz sent Frey a memo which in part confirmed a previous conversation between the two. The memo concluded by stating:

> As we discussed, we agreed that should Workhorse meet its 2002 $42M EBITDA target while moving forward on these key new product initiatives, we would pay a 50% add-on premium to your existing incentive bonus of 100% of base salary. Those amounts would be paid on the normal business cycle, normally March/April of 2003.

The parties agree that the EBITDA target for bonuses was eventually reduced, but there is a genuine dispute as to the specific level that had to be reached. Frey has offered evidence that the target was reached and bonuses were paid to other members of the 2002 management team in the spring of 2003.

Disappointed with the continuing efforts of Taitz to put him off regarding his pre-hire promises, and as a result of what Frey described as a problematic "political climate" and trust issues, Frey resigned from Workhorse in January

-10-

2003.  When he later asked about payment of his bonus, he was told he would not be paid a bonus for 2002 since he was no longer an employee at the payment time.  In this lawsuit, Workhorse maintains that the EBITDA target was not reached and Frey is owed no bonus.  Additional facts are noted below as needed, applying the summary judgment standard to the evidence.

*Analysis*

Frey seeks relief for breach of two promises:  to give him a share of the increase in the equity value of Workhorse, and to pay him a sizable bonus for 2002.  On the equity value issue, Frey alleges breach of contract, promissory estoppel, and constructive fraud.  On the bonus program, Frey alleges breach of contract and violation of the Indiana Wage Payment statute.  The parties agree that Indiana law applies to all claims.

I.      *Taitz and GVW as Defendants*

It is clear that Workhorse is an appropriate defendant on all claims, but Frey also seeks relief against Taitz as an individual and against GVW, the parent company of Workhorse.  Taitz and GVW seek summary judgment on the ground that neither is a proper defendant on any of Frey's claims, regardless of their potential merit.  Frey alleges in his amended complaint that Taitz acted outside the scope of his employment and operated Workhorse and GVW in furtherance of his own personal interests while disregarding corporate formalities, thereby

opening himself up to personal liability.  According to Frey, if his breach of contract claim fails, Taitz could be held liable on the promissory estoppel or constructive fraud claims because Taitz profited personally from his misleading statements and broken promises.  With respect to GVW, Frey maintains that the organizational chart of GVW shows that he had the responsibility of reporting to CEO Taitz and therefore had responsibilities to GVW.  He also contends, with supporting documentation, that the bonus plan and stock option plan that Taitz issued were GVW plans, not Workhorse plans, so that GVW can also be found liable on the promissory estoppel or constructive fraud claims.

Taitz and GVW argue that Taitz made all promises at issue in his capacity as a corporate officer of Workhorse.  Frey has provided no evidence of the disregard of corporate formalities or requirements by Taitz with regard to either GVW or Workhorse.  If an officer or shareholder who profited from the sale of shares of the corporation became liable for breach of the corporation's or its subsidiaries' obligations,  the essence of corporate structure would fail and there would be no need for the doctrine of piercing the corporate veil.  "In general, that doctrine holds individuals liable for corporate actions based on the failure to observe corporate formalities."  *Commissioner, Dep't of Environmental Management v. RLG, Inc.*, 755 N.E.2d 556, 563 (Ind. 2001), citing *Aronson v. Price,* 644 N.E.2d 864, 867 (Ind. 1994).  Only when it is clear that the corporation is a shell for the conduct of personal business and the corporate form has been abused to the point of promoting injustice or fraud will the doctrine apply.  *Id.*

Other than through the appropriate piercing of the corporate veil, an officer acting on behalf of the corporation is not liable for a corporation's contractual liability simply because he also benefits from the alleged wrong through his role as officer, director, or shareholder.  Taitz is entitled to summary judgment on the claims against him as an individual.[2]

The issues regarding GVW are different.  GVW claims that Frey has implicitly admitted that he has no breach of contract claim against it.  The title and substance of the key section of Frey's response brief suggest that he seeks to hold those two liable under only promissory estoppel or constructive fraud theories, and only if he is unsuccessful in his effort to prove that Workhorse breached a contract with him.  In the body of the brief, however, Frey distinguishes those two theories of liability, promissory estoppel and constructive fraud, as the only two applicable to Taitz, but not necessarily GVW.  Frey also points out that the written version of the applicable bonus plan at Workhorse is titled "GVW 2002 Incentive Compensation Plan" and that the stock options he was issued were for stock in GVW.  Frey is also listed in the organizational chart of GVW with direct line reporting responsibility to Taitz.  In short, the record at this

_____

[2]The Indiana Supreme Court has held that a corporate officer may be individually liable for environmental wrongs under three theories, including direct participation in the crime or tort, under the "responsible corporate officer doctrine" in environmental law, and under specific statutes that make the officer responsible as an individual. See *Commissioner, Dept. of Environmental Management v. RLG, Inc.*, 755 N.E.2d 556, 559-61 (Ind. 2001).  Those doctrines do not apply here, where all the claims are for breach of contract or are closely analogous to such claims.

point shows genuine factual disputes material to whether GVW could be held liable under one or more of the theories pursued in this lawsuit.  It would be premature to dismiss GVW as a defendant at this time on this record.

II.    *Breach of Contract*

    A.    *Equity Participation*

Frey alleges two separate contract breaches.  First, he claims that Workhorse failed to honor a contractual commitment to allow him to participate financially in all increases in the equity value of the company.  More specifically, Frey claims entitlement to an amount of money that would reflect the "normal" and "reasonable" participation in equity increases for a president of a start-up company.  The sale of the 72% interest in GVW to The Carlyle Group is at the heart of this claim.  Frey argues that during his first year at Workhorse, he was largely responsible for driving up the company's profits and EBITDA, which was used to price the sale of the interest The Carlyle Group.  Contrary to promises made to him when he left DeZurik to join Workhorse, Frey received no financial reward for the substantial increase in equity value he helped to create that first year.

Defendants argue that there was never a meeting of the minds with respect to Frey's equity participation and that the parties had no more than an unenforceable agreement to agree.  In the alternative, defendants argue that even

-14-

if there is a question of fact as to the existence of an enforceable agreement for equity participation, the issuance of GVW stock options and Frey's acceptance of those options satisfied any obligation.

There is no doubt here that the parties entered into a contract. Frey left his old job and worked for Workhorse for more than three years. Workhorse paid him hundreds of thousands of dollars over those years. The question is whether the terms of that contract included a legally enforceable promise to give Frey a share of the growth in the value of the company.

Contract law requires that the essential terms of an agreement be defined with reasonable certainty in order for the agreement to be enforceable. *Wolvos v. Meyer*, 668 N.E.2d 671, 676 (Ind. 1996); accord, *Brines v. Xtra Corp.*, 304 F.3d 699, 701 (7th Cir. 2002) (applying general contract law under ERISA and finding that employer's promise to develop and implement "an appropriate separation program" was too vague to be legally enforceable).

Frey relies on the principle of contract law that the parties' agreement need not be precise in every detail so long as there is a reasonable and objective basis for filling in the missing details. In a case holding that a loan commitment letter was sufficiently specific to be legally enforceable, the Seventh Circuit explained:

> The fact that some of the terms contained in the commitment, specifically paragraph 6(g), were inherently flexible does not render the contract unenforceable. Where the parties themselves have manifested an intent to

make a contract and to bind themselves to render future performance, the courts should not frustrate this intention by holding that a gap in one of the terms of the otherwise binding agreement renders the contract too vague and indefinite to enforce.

> "The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere 'wish, will, and desire' exists, either by virtue of the agreement itself or by commercial practice or other usage or custom.  This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it 'in good faith' in accordance with some existing standard or with facts capable of objective proof."

Corbin on Contracts, § 95, pp. 401-402; § 97, pp. 425-426.

*Sonnenblick-Goldman Corp. v. Murphy*, 420 F.2d 1169, 1173 (7th Cir. 1970) (applying Illinois law).

The undisputed facts in this case show that Taitz's general promise or proposal to provide a phantom stock plan never progressed to the point where there was any certainty with respect to the mechanics of the plan or how any financial reward for Frey would be measured.[3]  The undisputed facts show there was no agreement as to the number of any phantom shares to be credited to Frey or the applicable price.  Frey himself recognized the deficiency, of course, in his letter dated May 10, 1999 asking for more details.  He could not reasonably have missed the significance of the fact that Taitz responded to his concerns by sending only "the most recent draft" of the phantom stock plan.

---

[3]The "EVA" incentive plan that Taitz also promised was to be a bonus program as opposed to an equity participation program.

To address this absence in the documentation, Frey has testified that he and Taitz agreed that he would receive a "normal" or "reasonable" amount of participation in equity growth, and that it would be worth "millions." This standard, he says, should be a sufficient agreement on terms to allow him to offer expert testimony to fill in the blank as to what would be "reasonable" or "normal" under the circumstances.

There are several problems with this approach. First, the undisputed facts show that Frey's employment arrangement was custom-tailored. The give and take on salary, bonus, perquisites, benefits, length of service, and equity participation show that each element was part of a unique and integral package. Any attempt to single out a critical element and to try to determine what is "normal" or "reasonable" from evidence of what others have negotiated or averages of what others have received in different circumstances would require the court to impose a contract on the parties that they never agreed upon.

Second, Frey himself testified that the range of reasonable or normal participation could be as wide as from 1.2 percent to 12 percent of the growth in equity value. Frey Dep. at 71-72, 195. He also described conversations in which Taitz promised "millions of dollars" if equity value increased by $100 million, and Taitz showed projections with benefits to Frey ranging from $5.6 million to $8.2 million. Frey Dep. at 74-75. Those broad and vague ranges are strong evidence that the court could not enforce a contract term on this topic without simply

making up a term for the parties to which they never agreed, as Frey himself indicated when he wrote to Taitz to seek a more specific promise on the subject.

Third, in opposing summary judgment, Frey has not actually offered any expert testimony on the issue of what would be "normal" or reasonable."  Even if one assumes that such testimony could pass muster as qualified expert testimony, the court cannot deny summary judgment based on a party's promise to come forward later with evidence to fill a hole in his case.  "As we have often stated, summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'"   *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2003), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

That is not to say that Frey had no reason or basis to rely on Taitz's promise to institute some form of equity participation plan.  That evidence is more relevant, however, to Frey's promissory estoppel claim.[4]  The evidence does not provide sufficient definition to produce an enforceable contract for an unspecified degree of participation in equity growth.  Viewing the facts in a light most favorable to Frey, there was no agreement on what he admits was an essential

---

[4]For example, at trial on the promissory estoppel claim, it may be possible for Frey to offer qualified evidence of "normal" or "reasonable" terms for the more limited purpose of showing that he reasonably relied on Taitz's non-specific promises, even though he cannot recover for a breach of contract.

term.  At most, the parties agreed to reach a better defined agreement later.  Such an agreement to reach an agreement later is not enforceable under Indiana law.  *Wolvos*, 668 N.E.2d at 674; accord, *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 358-360 (7th Cir. 2001).

Here, undisputed evidence shows that the agreement negotiated and reached between Frey and Taitz never included anything more specific than an assurance that Workhorse would later set up some sort of phantom stock program that would give Frey the potential to make considerably more money at Workhorse than he would have made at DeZurik.  The undisputed evidence thus shows that the parties never agreed on the essential terms of the program, including how much phantom stock would be issued or how the value of the stock would be measured.  Frey did not have an enforceable contract to participate in the growth in the equity value of Workhorse.

B.      *2002 Bonus Claim*

Frey's second claim for breach of contract is for the failure to pay him a 2002 incentive bonus.  On that issue, Workhorse and GVW are not contending that an enforceable contract did not exist.  They argue instead that Workhorse missed the applicable EBITDA target so that Frey has no claim to a bonus for 2002.  Frey argues that the first 100% of the 150% salary bonus for 2002 was not conditioned on the attainment of any EBITDA target, but he has not come forward with evidence that would allow a reasonable jury to agree with him.  His own

testimony is to the contrary.  See Frey Dep. at 162-65 (earlier oral bonus promises were tied to company performance; Frey viewed earlier promises as illusory; and 2002 promise was to pay $300,000 "if we hit these dollars").  Even viewing the evidence in the light reasonably most favorable to Frey, the entire potential bonus for 2002 was subject to the financial performance of Workhorse.

Frey has come forward with evidence, however, that would allow a reasonable jury to find that the company actually met one or more target EBITDA levels so that Frey is owed all or at least part of the entire bonus.  Frey testified that by the time he left Workhorse in January 2003, the company had already met the revised EBITDA target for 2002 in place at that time.  As president of the company, he was in a position to know the company's results as measured against the target.  He also has offered evidence that Workhorse/GVW paid incentive bonuses to other managers for 2002 under the same program.  That evidence also tends to show that the target was met.  Assuming the bonus program created a valid contract, any attempt by Taitz or Workhorse to alter the target or inexplicably to adjust the EBITDA calculation after Frey left would be a unilateral alteration that should not affect his qualification for the bonus.  Moreover, Taitz's deposition testimony indicated that Frey could earn at least a percentage of the bonus if the company reached only 85% of the EBITDA target.  Taitz Dep at 199-200.  This testimony, along with other evidence, at the very least creates genuine issues of material fact concerning the applicable EBITDA target(s) and whether any applicable target was met.

Finally, Frey notes that when he first inquired about obtaining his 2002 bonus, Workhorse responded that he had to be employed when the bonus was distributed in order to qualify. That condition was not originally imposed when Taitz explained the plan to him and then later agreed to raise the 100% bonus by another 50% if Frey could increase overall efforts and successfully attain the EBITDA target number. Also, defendants have not made the same argument in opposing summary judgment. This inconsistency in defense to Frey's claim for payment of the bonus could reasonably be interpreted as calling into question the veracity of the affidavit testimony of the Workhorse CFO with respect to what the agreed EBITDA target was and whether or not it was reached. In short, Frey has raised genuine issues of material fact as to whether Workhorse and/or GVW breached a contract with him to pay him a bonus for 2002.

III.   *Promissory Estoppel*

Although Frey did not have an enforceable contract for equity participation, he has presented evidence to survive summary judgment on a more limited claim of promissory estoppel based on Taitz's promise to him on behalf of Workhorse (and perhaps GVW). Indiana law requires five elements for promissory estoppel: (1) a promise; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcing the promise. *Truck City of Gary, Inc. v. Schneider Nat. Leasing*, 814 N.E.2d 273, 279 (Ind. App. 2004). Defendants argue that Frey has no viable claim of promissory estoppel

because (a) he did not rely on any promises made by Taitz when he resigned from DeZurik and (b) he has no damages because he signed a settlement agreement with DeZurik that provided him with another year of salary in exchange for his giving up claims to other benefits.  The arguments are not persuasive, at least as a matter of law.

In deciding questions of state law, this court's responsibility is to apply the law of the state as it believes the highest court of the state would apply it if presented with the same issues.  *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 796 (7th Cir. 2004).  Promissory estoppel is the doctrine that Indiana courts would find most applicable to the facts presented here.   Under Indiana law, when an employee is lured away from the relative security of an existing job with promises that may not amount to an enforceable contract, promissory estoppel can provide suitable relief, though in the form of more limited reliance damages rather than the benefit of the alleged (but unenforceable) bargain.   *Jarboe v. Landmark Community Newspapers of Indiana, Inc.*, 644 N.E.2d 118, 122 (Ind. 1995), citing with approval *D&G Stout, Inc. v. Bacardi Imports, Inc.*, 923 F.2d 566, 569 (7th Cir. 1991).[5]

---

[5]In *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 702-03 (7th Cir. 2004), the Seventh Circuit noted that under Indiana's law of promissory estoppel, a promise supporting a claim need not be as clear as a contractual promise would need to be, and that Indiana law may go further than other states in this direction of enforcing less specific promises, citing *First National Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 955 (Ind. 1991).

In *Jarboe* the Indiana Supreme Court affirmed the availability of promissory estoppel as a theory of recovery in at-will employment cases and refined the definition of the damages available under that theory.  The court held that the trial court had improperly granted summary judgment in favor of an employer on a claim for promissory estoppel based on a promise to employ the plaintiff indefinitely (which was not enforceable as a matter of contract law).  The Indiana Supreme Court agreed with the comment in the Restatement (Second) of Contracts § 90(1) that the character and scope of relief available through a promissory estoppel claim may be limited to restitution or to damages based on the scope of reliance.  *Jarboe*, 644 N.E.2d at 121.  With a favorable nod to the analysis employed by the Seventh Circuit in *D & G Stout v. Bacardi Imports*, the Indiana Supreme Court explained that reliance damages may include both out-of-pocket expenses (such as moving expenses) and forgone wages.  644 N.E.2d at 122.  Expectation damages, however, such as what the plaintiff might have earned with a new employer if the promise had been kept, are not recoverable on this theory.  *Id.*; see also *First National Bank v. Logan Manufacturing Co.*, 577 N.E.2d 949, 956 (Ind. 1991) (affirming jury verdict for reliance damages in promissory estoppel case where bank's oral promise to extend loan was not enforceable as contract).

In this case, Frey has offered ample evidence that he relied on Taitz's promises of equity participation when he accepted the offer of employment with Workhorse.  Taitz himself admits that he expected Frey to rely on the promises set

forth in his letters, including in particular the promise of equity participation. Taitz Dep. at 122. That evidence, along with the evidence of extended negotiations sufficient to assure Frey that Taitz would follow through on the (non-contractual) promise, is sufficient to present a question of fact as to reasonable reliance. See *Garwood Packaging*, 378 F.3d at 705 (reasonableness of reliance is ordinarily a question of fact, but affirming summary judgment for promisor where question could be answered only one way).

The fact that Frey sent a letter announcing his intention to retire to DeZurik before finalizing his acceptance of the position with Workhorse does not undermine his claim of reliance, at least as a matter of law. At that time, Frey had in hand the promise of a firm salary figure with a promise that additional bonus and equity plans would also be put in place. While Frey received a year of salary from DeZurik as a part of his negotiated departure settlement (and Frey has agreed that amount should be a set-off against any reliance damages he can prove), Frey has also testified that the available stock options, pension payments and benefits that would have vested if he had stayed at DeZurik through 1999 would have been worth considerably more than that single year of salary payments.

The court assumes that Frey was an at-will employee at DeZurik, but the evidence would easily allow a jury to conclude that Frey was likely to complete at least another six months at DeZurik but for the inducements that Taitz offered

him to leave and to join Workhorse.  Defendants will be able to argue the issue of reliance to the jury, but when considering the evidence in the light reasonably most favorable to Frey, a reasonable jury could find that he relied on Taitz's promise of equity participation when he left DeZurik.  Workhorse and GVW are not entitled to summary judgment on Frey's promissory estoppel claim based on the promise of equity participation at Workhorse.

IV.   *Constructive Fraud*

Frey also seeks relief on a theory of constructive fraud.  Under Indiana law, constructive fraud arises by operation of law when a course of conduct, regardless of intent, would provide one party an unconscionable advantage over another if sanctioned by the law.  *Doe v. Howe Military School*, 227 F.3d 981, 991 (7th Cir. 2000).  To prevail on a claim of constructive fraud in Indiana, a plaintiff must prove:  (1) a duty owed to plaintiff by virtue of the relationship between the parties; (2) representations or omissions of past or existing facts made in violation of that duty or silence when a duty to speak exists;  (3) plaintiff's reliance thereon; (4) injury as a proximate result thereof; and (5) the gaining of an advantage by the defendant at the expense of the plaintiff.  *Rice v. Strunk*, 670 N.E.2d 1280, 1283-84 (Ind. 1996).  Whether a legal duty exists is generally determined as a matter of law.  *Duffy v. Ben Dee, Inc.*, 651 N.E.2d 320, 322 (Ind. App. 1995).  The issue depends on several factors:

> Ordinarily, whether the law recognizes any duty on the part of a particular defendant to conform the defendant's conduct to a certain standard for the

benefit of the plaintiff requires that three factors be balanced: (i) the relationship between the parties, (ii) the reasonable foreseeability of harm to the person injured, and (iii) public policy concerns.

*Rice*, 670 N.E.2d at 1284.

There was no fiduciary relationship between the parties here, but "confidential" relationships can at times come with a corresponding duty when one party has a superior degree of knowledge. If breached, such a duty could support a claim of constructive fraud brought by the party in a position of weakness or lesser knowledge. *Nicoll v. Community State Bank,* 529 N.E.2d 386, 389 (Ind. App. 1988).

When the court denied defendants' motion to dismiss this claim for failure to state a claim for relief, the pleadings did not show as a matter of law that Taitz was not in the unique position of possessing knowledge not possessed by Frey, leaving Frey in a state of relative weakness or providing any of the defendants with an unconscionable advantage. At the summary judgment stage, however, Frey has not come forward with evidence sufficient to show that Taitz had some superior knowledge or took unconscionable advantage of him. According to Frey's own testimony, he had a stable, high-level position with no need to seek out other employment. While the corporate structure of Workhorse may have been somewhat fluid, Frey was never put in a bargaining position where he would have risked much if he had insisted that Taitz set out in writing the exact terms of any employment arrangement before he agreed to leave DeZurik to accept the job at

Workhorse.  Taitz had no obligation to do so.  The constructive fraud claim fails on the first element of duty, without reaching the other elements.


V.     *Indiana Wage Payment Claim*

To the extent that Frey's 2002 bonus was conditioned on the performance of the company, it is not a wage and cannot be the subject of a claim under the Indiana statute.  *Highhouse v. Midwest Orthopedic Institute*, 807 N.E.2d 737, 740 (Ind. 2004).  Frey's own testimony confirms that the bonus was to be based on company performance.  Frey Dep. at 164-65.  He has not offered evidence sufficient to allow a jury to find otherwise.  Defendants are entitled to summary judgment on Frey's claim under Ind. Code § 22-2-5-2.


*Conclusion*

For these reasons, defendants' motion for summary judgment is denied with respect to Frey's promissory estoppel claim against Workhorse and GVW based on the promise of equity participation and his breach of contract claim against Workhorse and GVW for the 2002 bonus.  Defendants' motion for summary judgment is granted as to all other claims.


So ordered.

Date: June 21, 2006

_David F. Hamilton_
_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Irving L. Fink
YOSHA KRAHULIK & LEVY
iprince5@hotmail.com

Christian A. Jenkins
MEZIBOV & JENKINS LLP
cjenkins@mezibovjenkins.com

Marc D. Mezibov
MEZIBOV & JENKINS
mmezibov@mezibovjenkins.com

James H. Ryan
HORWOOD MACUS & BERK CHARTERED
jryan@hmblaw.com

Robert J. Schuckit
SCHUCKIT & ASSOCIATES, P.C.
rschuckit@schuckitlaw.com

Hal J. Wood
HORWOOD MARCUS & BERK CHARTERED
hwood@hmblaw.com